# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| MONIQUE CRUMMETT<br>353 Wingood Road<br>Windsor, ME 04363<br><br>Plaintiff,<br><br>v.<br><br>THE HONORABLE ROBERT L. WILKIE,<br>Secretary of Veterans Affairs,<br>U.S. Department of Veterans Affairs<br>810 Vermont Avenue, NW<br>Washington, DC 20420<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:20-cv-<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff MONIQUE CRUMMETT, by counsel, and complains of Defendant ROBERT L. WILKIE, in his official capacity as Secretary of Veterans Affairs, U.S. Department of Veterans Affairs, as follows:

## NATURE OF THE ACTION

1. Plaintiff is a former employee of the Defendant who was subjected to years of unlawful harassment and discrimination that included hostile treatment by supervisors, isolation, reassignments, downgraded performance appraisals and a repeated practice of withholding information necessary for the Plaintiff to do her job or to address the harassment she was facing. Ultimately, Plaintiff was removed from federal service and had to seek disability retirement as a result of the Defendant's failure to provide reasonable accommodation for her disability.

2. Plaintiff brings this action to recover damages for Defendant's unlawful discrimination based on race, color, disability and reprisal in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act").

## PARTIES

3.  Plaintiff Monique Crummett resides at 353 Wingood Rd., Windsor, ME 04363.

4.  Defendant, Robert L. Wilkie, is the Secretary of Veterans Affairs for the U.S. Department of Veterans Affairs ("VA) and is sued in his official capacity as the head VA.

## VENUE AND JURISDICTION

5.  This Court has federal question jurisdiction pursuant to Title VII, the Rehabilitation Act, and 28 U.S.C. Section 1331.

6.  Venue is proper in this District because the unlawful practices were committed in the state of Maine. 42 U.S.C. § 2000e-(5)(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.  Plaintiff exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.

8.  On August 21, 2018, Plaintiff filed a formal EEOC complaint (Agency Case No. 200H-0402-2018105426).

9.  On June 19, 2019, Plaintiff filed a second formal EEO complaint (Agency Case No. 200H-0402-2019103644).

10. At the conclusion of the Defendant's investigation of her complaints, Plaintiff requested a hearing before an EEOC Administrative Judge.

11. Plaintiff's claims were consolidated by an EEOC Administrative Judge.

12. Thereafter, Plaintiff withdrew her hearing request and requested a Final Agency Decision.

13. On August 14, 2020, the Defendant issued its Final Agency Decision in Plaintiff's consolidated EEO complaints.

## FACTS

14. Plaintiff is bi-racial and perceived as African-American and/or black.

15. Plaintiff suffers from physical disabilities including a right shoulder sprain, neck sprain, superior labrum anterior and posterior lesion and supraspinatus tear. Her medical conditions were first diagnosed on March 31, 2014 and are expected to be permanent. These physical disabilities limit the Plaintiff's major life activities, including the ability to work, and restrict the Plaintiff's ability to, among other things, lift, pull or push over 25 pounds.

16. Life activities affected by Plaintiff's medical condition include: inability to open closed containers or jars to feed herself and her family; inability to lift more than twenty-five (25) pounds; inability to dress herself related to zipping up the back of dresses; inability to lift her son or coach his sports teams; inability to engage in repetitive motions, and inability to engage in any activity involving keeping her arms above her head for any extended period of time.

17. Plaintiff's ability to perform these life activities differs from the ability of the average person's ability to perform the same life activity, because she has decreased use and range of motion with her right arm as compared to the average person, and the average person can lift and keep their right arm over their head.

18. Plaintiff reduces or eliminates the limitations caused by her medical condition by using monthly osteopathic manipulation to minimize the loss of use of her arm and further damage, and injections for pain as needed for flare-ups.

19. Plaintiff's daily work-related tasks after August 2018 included processing consults to coordinate the care of Veterans traveling to other states, which are sedentary activities conducted

via phone, the electronic medical record, or secure email. Her work restrictions included: reaching no more than four hours, reaching above shoulder no more than two hours, and pushing/pulling/lifting no more than two hours per day with a twenty-five (25) pound limit.

20. Plaintiff's conditions have worsened over time as a result of the stress caused by the ongoing harassment and her reassignment, as stress can cause acute flare-ups requiring treatments such injections. For example, Plaintiff required a ligament injection due to severe pain; saw an anesthesiologist for evaluation of surgical/invasive treatment modalities to manage her worsening symptoms; and began taking depression medication and counseling in an attempt to decrease her work-related stress.

21. Plaintiff engaged in protected EEO activity in 2015, 2016, 2017, 2018, and 2019, including complaining of discrimination, attending EEO mediation, initiating EEO counseling and filing formal EEO complaints.

22. Plaintiff began her employment with the VA in October 2010.

23. From 2010 to July 8, 2018, Plaintiff was an Oncology Care Coordinator at the VA Maine Health Care System in Togus, Maine. Plaintiff was offered this position as a permanent light duty assignment.

24. On July 8, 2018, Plaintiff was reassigned to the position of Community Care Nurse; then on August 1, 2018, she was further reassigned to the position of Traveling Veteran Coordinator at VA Maine Health Care System, Augusta, Maine.

25. During the relevant time period, and prior to July 8, 2018, Plaintiff's first-line supervisor was Tara Chamberlin (Caucasian), Nurse Manager, Medical Specialty Clinics. After July 8, 2018, Plaintiff's first line supervisor was Katie-Lynn Nelson (Caucasian), Nurse Manager, Community Care. Plaintiff's second line supervisor at all from 2015 to July 2018 was Dr. Ronnie

Marrache (Caucasian), Chief of Medicine, and thereafter it was Corey Vail, Director, VA Community Care.

*Hostile Work Environment*

26. Since 2015, and continuing through Plaintiff's termination from employment in November 2019, the Defendant, through Dr. Abby Thrower, Chief of Oncology, and others as described herein, subjected Plaintiff to ongoing harassment, which included, for example, calling Plaintiff's personal phone during off tour hours, refusing to discuss patient care concerns with Plaintiff, openly questioning staff about whether Plaintiff was having sexual relations with an oncologist, and discussing the alleged sexual relations with the oncologist at his midterm review.

27. In or around January 2016, Thrower called the Plaintiff while the Plaintiff was off work to inform the Plaintiff that Thrower would not be coming to work and that Plaintiff needed to reschedule her patients. Thrower failed to follow the proper procedure for medical providers calling out. Based upon information and belief, no other Nurses were subjected to these unnecessary calls, voicemails and directives while off work.

28. Thrower further harassed Plaintiff by consistently interfering with her ability to complete her work by coming into Plaintiff's office multiple times from 2016 through 2018, demanding that Plaintiff explain incident reports the Plaintiff entered regarding errors in patient care.

29. Thrower confronted Plaintiff almost every time her name was listed on an incident report. As the Oncology nurse expert for VA Maine, Plaintiff was often consulted by other VA staff to review and clarify any issues related to the ordering, dosing, or administration of chemotherapy; as a result, Plaintiff was listed on reports regarding any Oncology related incidents.

5

30. If the errors were noted on patients of other physicians, Thrower encouraged staff enter to enter reports.

31. Based upon information and belief, similarly situated Nurses of a different race, color and disability status than Plaintiff were not subjected to the same harassment regarding incident reports they entered.

32. On October 5, 2016, Dr. Ronnie Marrache, Chief of Medicine, relocated the Plaintiff's office to a secluded office on the 7th floor despite the fact that the Oncology department where Plaintiff worked was on the 4th floor and despite the Plaintiff being the veteran Oncology nurse on staff.

33. Based upon information and belief, similarly situated Nurses of a different race, color and disability status and with less experience than the Plaintiff did not have their offices moved.

34. In the summer of 2017, Thrower confronted another Physician during the Physician's mid-year review with a rumor and suggestion that there was a sexual affair between the Physician and the Plaintiff.

35. Thrower's discussion of the baseless rumor was spread to Plaintiff causing her personal and professional embarrassment, stress, anxiety and harm to her reputation.

36. Thrower refused to discuss patient concerns with Plaintiff several times from 2015 through 2018.

37. In March 2016, for example, Thrower instructed Plaintiff to contact a patient but the patient was to receive life threatening medical results, which Thrower, not the Plaintiff, was required to communicate and discuss with the patient. When Plaintiff attempted to discuss this with Thrower, she refused to acknowledge it was her responsibility, insisted that Plaintiff contact

the patient, became frustrated and hostile toward the Plaintiff and threatened her, before relenting and agreeing to call the patient herself.

38. In another instance, in January 2018, Thrower refused to meet with a patient and refused to discuss the patient's clinical emergency with the Plaintiff. Thrower told Plaintiff she did not have time for the patient and that it was the Plaintiff's problem to deal with. Another physician ultimately had to meet with the veteran because Thrower refused to do so. Plaintiff tried reporting her concern to her supervisor, Chamberlin, but was told she did not have time to discuss her concerns. Ultimately, Plaintiff was able to meet with the Assistant Chief of Medicine and while in tears relayed her concerns and the ongoing harassment she was facing.

39. On April 27, 2018, Thrower called Plaintiff on the phone regarding an assignment and became verbally aggressive and hostile toward Plaintiff. After the call, Thrower cornered the Plaintiff in Plaintiff's office after her regular tour hours and continued her aggressive and hostile treatment, even repeatedly refusing to leave despite Plaintiff's requests. Thrower's behavior caused Plaintiff to physically shake and cry.

40. Plaintiff filed a formal report on April 30, 2018 regarding this incident; however, there was no follow-up to the report by Chamberlin, as well as no explanation for the lack of follow-up.

41. Instead, on June 21, 2018, Marrache issued the Plaintiff an informal disciplinary action in the form of formal written instructions, chastising Plaintiff for raising her voice when she had to repeatedly ask Thrower to leave her office.

42. Based upon information and belief, no action and no instructions or warnings were issued to Thrower for her conduct on April 27, 2018.

43. On June 14, 2018, during morning Oncology "huddle" while the staffing for the day was being discussed, Thrower announced that Plaintiff was not allowed to work in the chemotherapy room due to her work injury. This singled out Plaintiff among her coworkers and embarrassed her.

44. Since 2015, Plaintiff's reports of harassment were ignored by Ryan Lilly, Facility Director, Dr. Ronnie Marrache, Chief of Medicine, Theresa Bouthot, Nurse Manager, Tara Chamberlin, Nurse Manager/Supervisor, and Human Resources officials.

45. During a March 6, 2017 meeting between Lilly, Plaintiff, and her husband, Lilly stated he would investigate their concerns of racial discrimination and harassment.

46. On or about September 1, Plaintiff met with the Defendant's Assistant Human Resources Officer, James Champ, regarding the discrimination and harassment Plaintiff was subjected to by Thrower, Chamberlin, Marrache and others. Mr. Champ said he would conduct a formal investigation. However, Champ only conducted informal fact finding, which resulted in an incomplete report that the Defendant failed to provide to the Plaintiff until several months later and it only focused on Marrache and disregarded other claimed harassment and discrimination.

47. On or about February 7, 2018, Plaintiff attempted to address her harassment and discrimination concerns with Lilly again and determine the status of his investigation but was told that Lilly would not meet with her until other processes played out.

48. Based upon information and belief, claims of harassment by Caucasian and/or non-disabled employees similarly situated to the Plaintiff are investigated thoroughly, addressed and remedied by the Defendant.

8

*Proficiency Ratings*

49. On March 17, 2017 Plaintiff was issued a proficiency rating of "Highly Satisfactory," which was lower than Plaintiff's performance justified and lower than previous years, as Plaintiff received an "Outstanding" rating on every proficiency since coming to VA Maine in 2010. The rating was issued two months late.

50. Plaintiff's annual Proficiency Report is due every January; however, on June 13, 2018, Chamberlin issued Plaintiff a proficiency rating of Highly Satisfactory, which was lower than her performance justified and issued five months late.

51. Based upon information and belief, other similarly situated Nurses of a different race, color and disability and protected activity status received timely proficiency ratings of Outstanding in 2017 and 2018 despite performing at an equal or lesser level as the Plaintiff during the rating periods at issue.

52. On or about June 14, 2018, Plaintiff attempted to meet with Marrache to discuss her concerns regarding harassment and discrimination, including specifically her proficiency rating issued on June 13, 2018, but Marrache refused to meet with her until after an administrative investigation was completed.

53. On July 10, 2018, Marrache denied Plaintiff's appeal of her proficiency rating from June 2018.

*Denied Promotion to Nurse III*

54. In 2012, Plaintiff was promoted to Nurse II. Plaintiff lacked a Bachelors degree at that time, which was an educational requirement, but was granted a waiver. At that time, Plaintiff was told by the Defendant that she should think about obtaining her Bachelors degree so that the Defendant could consider her for promotion to Nurse III.

9

55. In 2014, Plaintiff was denied a promotion to Nurse III solely because she did not meet the educational requirements as she still had not obtained her Bachelors degree and was not eligible for a waiver.

56. Plaintiff's proficiency had to be completed before she could be presented to the Nurse Professionals Standards Board (NSPB) for review of promotion to Nurse III each year.

57. Upon completion of her Bachelors of Science in Nursing program in August 2016, Plaintiff was nevertheless still not promoted in 2017 because the Defendant issued her proficiency late.

58. Plaintiff appealed through the VA Central Office but was still not promoted. Chamberlin was responsible for the delay in issuing the Complainant's proficiency and Marrache was the approving official on the delayed proficiency.

59. Furthermore, Plaintiff was not promoted despite her proficiencies being written to the Nurse III Standards since 2013 and previously meeting all standards in 2014.

60. On or about May 23, 2019, Plaintiff was again informed by the Defendant that she was denied a promotion following her appeal of the 2018 promotion denial. The appeals process was significantly delayed because the Plaintiff's proficiency was issued late and her prior supervisor, Chamberlin, failed to notify her of the reconsideration decision in October 2018.

61. On August 20, 2019, the Defendant again denied Plaintiff's promotion to Nurse III and this action was approved by the Defendant on August 27, 2019 but the Plaintiff did not receive notification via email until on or about September 12, 2019.  Plaintiff's ability to meet the criteria for promotion in her new position and to establish her qualifications and proficiency was harmed by the Defendant's failure to issue Plaintiff a specific criteria-based functional statement and

qualification standards and/or other feedback regarding formal expectations for the reassignment position.

62. From 2017 to 2019, Plaintiff was fully qualified for promotion but was denied promotion due to her race, color, disability and protected EEO activities.

*Reassignment & Failure to Accommodate*

63. On June 22, 2018, in response to Plaintiff's reports of harassment, rather than directly addressing Thrower's misconduct, the Defendant removed Plaintiff from the Oncology Department and reassigned her to a position as a VA Community Care Nurse, effective July 8, 2018.

64. Plaintiff was highly successful in the Oncology department, her disability was accommodated in her position, she did not ask to be moved and there was no legitimate reason to move her.

65. Plaintiff notified the Defendant that the new position did not account for or meet her permanent physical restrictions.

66. The Defendant indicated, through Dustin Cochran, Employee/Labor Relations Specialist, that it would get the reassignment approved through the Department of Labor.

67. Defendant later refused to approve Plaintiff's request for administrative leave while the reassignment and accommodation issues were resolved and so the Plaintiff had to exhaust most of her sick and annual leave before returning to a position that violated her restrictions.

68. On July 27, 2018, Lilly was unable to provide a legitimate explanation for Plaintiff's reassignment and told her that he felt he was doing the Plaintiff a favor because he believed she was miserable in Oncology.

69. Based upon information and belief, other Caucasian and/or non-disabled similarly situated employees were not reassigned after complaints of harassment.

70. On August 1, 2018, Plaintiff suffered a cardiac event while at work, as a result of the harassment caused by Defendant and Plaintiff's reassignment to a position that did not accommodate her disability. Plaintiff missed work for several weeks without pay because her leave had previously been exhausted.

71. On August 19, 2018, Plaintiff requested to return to Oncology pending Thrower's transfer to another facility in October 2018, but Lilly denied her request without explanation.

72. Instead of moving Plaintiff back to Oncology, the Defendant created the position of Traveling Veteran Coordinator, allegedly to meet her permanent medical restrictions which the Defendant had since acknowledged were not accommodated by the initial reassignment position.

73. Despite reassigning the Plaintiff, the Defendant failed to notify the Department of Labor (DOL) of this reassignment, thereby failing to provide Plaintiff a written criteria-based functional statement approved by DOL for her new position.

74. Cochran informed Plaintiff that he had worked extensively with DOL, and that DOL had approved her reassignment and position description/functional statement; but this was false.

75. However, Plaintiff did not receive any formal correspondence from DOL indicating this approval. Upon contacting the DOL, Plaintiff learned that the Defendant had not notified them of her reassignment.

76. Plaintiff's disability, and symptoms thereof, worsened as she continued to perform the duties of her new position.

77. From July 2018 through January 2019, the Defendant refused to provide a functional statement for the Traveling Veteran Coordinator position, which delayed Plaintiff's proficiency rating. The lack of a functional statement gave Plaintiff no criteria to follow for her proficiency report that covered the portion of her rating period after she was reassigned to the Traveling Veteran Coordinator position.

78. Beginning on or about June 24, 2019, Plaintiff was unable to work in her position as Traveling Veteran Coordinator because the repetitive duties required of the position – including typing, using the phone, and completing and processing paperwork – had aggravated her disability to such a degree that she was physically unable to continue performing her job duties.

79. On or about June 24, 2019, Plaintiff underwent medical treatment to address the worsening conditions she was experiencing due to the aggravation on her disabilities caused by her new position. Plaintiff's physician approved Plaintiff for medical leave to recover from the worsening conditions, treatment and pain.

80. Subsequently, on July 26, 2019, she received correspondence from DOL denying compensation for time she had missed from work because DOL thought she was still employed as an Oncology Care Coordinator due to the Defendant's failure to coordinate and/or get approval for her reassignment.

81. On August 16, 2019, Plaintiff notified her supervisor that because DOL had not been notified of her reassignment, she was not receiving worker's compensation pay and was at risk of losing her benefits.

82. Plaintiff also notified her supervisor that her medical provider was not going to clear her to return to work until she was returned to the Oncology Care Coordinator position that was the only position approved by DOL for the Plaintiff given her disabilities and limitations.

83. On August 27, 2019, Plaintiff was informed that she would be placed on Absence Without Leave (AWOL) status, retroactive to June 24, 2019, which was a direct result of the Defendant failing to coordinate her reassignment with DOL and to accommodate her disability.

84. On September 9, 2019, Plaintiff again notified her supervisor and numerous other officials at the Defendant that her position did not accommodate her disability, was worsening her conditions because she was sitting at a desk typing all day, and she was physically unable to continue in that position due to her doctor's recommendation. She also provided the Defendant with letters that she and her doctor had sent in August to DOL regarding the Defendant's reassignment action not being properly cleared with DOL and the reassignment position not accommodating her disability and causing her condition to worsen to the point where she could not continue to work.

85. Despite all of this information, the Defendant made no effort to engage in any interactive process with the Plaintiff.

86. On November 4, 2019, Plaintiff was issued a proposed termination based upon the charge of Absence Without Leave.

87. At the time of the proposed termination, the Defendant was aware that the Plaintiff was absent for medical reasons related to her physical disability, including specifically that she was unable to perform the duties of her position as the Traveling Veteran Coordinator because of her disability.

88. Plaintiff, and her physician, had informed the Defendant that Plaintiff was unable to perform the duties of her Traveling Veteran Coordinator position because the constant typing and repetitive desk work required by the sedentary position – including the impact on her shoulder

from typing, holding the phone and/or manipulating paper – had severely aggravated her disability to the point where she could no longer continue to perform the duties of the position.

89. Defendant made no efforts to determine what reasonable accommodations were possible for the Plaintiff and failed to engage in the interactive process, to include possibly reassigning the Plaintiff to her prior position as an Oncology Care Coordinator, where she had been successfully accommodated for many years prior to her reassignment in 2018.

90. But for the Defendant's failure to accommodate the Plaintiff, to include returning her to her prior permanent light duty position that was approved by DOL, the Plaintiff would have remained an employee of the Defendant through her retirement no earlier than the age of 62.

## COUNT 1

91. Plaintiff repeats and realleges paragraphs 1-90 as if more fully set forth herein.

92. Plaintiff was subject to discrimination and harassment on the basis of her Race and Color in violation of Title VII.

93. By and through its conduct, Defendant willfully violated Title VII by subjecting her to a hostile work environment and failing to address Plaintiff's reports of harassment, reassigning her, lowering her proficiency ratings, denying her promotion, placing her in an AWOL status, and proposing her termination.

94. As a result of the Defendant's unlawful actions, Plaintiff has sustained damages consisting of lost wages and benefits, mental anguish, emotional distress, pain and suffering and other pecuniary and non-pecuniary damages.

## COUNT 2

95. Plaintiff repeats and realleges paragraphs 1-90 as if more fully set forth herein.

96. Plaintiff was subject to discrimination, harassment, and retaliation on the basis of her physical disability in violation of the Rehabilitation Act.

97. By and through its conduct, Defendant willfully violated the Rehabilitation Act by subjecting the Plaintiff to a hostile work environment and failing to address Plaintiff's reports of harassment, reassigning her, lowering her proficiency ratings, denying her promotion, placing her in an AWOL status and proposing her termination.

98. As a result of the Defendant's unlawful actions, Plaintiff has sustained damages consisting of lost wages and benefits, mental anguish, emotional distress, pain and suffering and other pecuniary and non-pecuniary damages.

## COUNT 3

99. Plaintiff repeats and realleges paragraphs 1-90 as if more fully set forth herein.

100. Plaintiff was subject to retaliation for her prior EEO Activity in violation of Title VII.

101. Plaintiff participated in protected activity by objecting to race, color, and disability-based discrimination since 2015, participating in EEO mediation in 2016, reporting discrimination and unlawful harassment directly to management in 2017 and 2018, initiating EEO counseling and filing formal complaints in 2018 and 2019.

102. As a result, the Defendant subjected the Plaintiff to an increasingly hostile work environment, lowered her proficiency ratings, reassigned her, denied her promotion, placed her in an AWOL status and proposed her termination

103. As a result of the Defendant's unlawful actions, Plaintiff has sustained damages consisting of lost wages and benefits, mental anguish, emotional distress, pain and suffering and other pecuniary and non-pecuniary damages.

## COUNT 4

104. Plaintiff repeats and realleges paragraphs 1-90 as if more fully set forth herein.

105. The Defendant violated the Rehabilitation Act by failing to engage in the required interactive process with the Plaintiff and failing to accommodate the Plaintiff's disability.

106. By and through its conduct, Defendant willfully violated the Rehabilitation Act.

107. As a result of the Defendant's unlawful actions, Plaintiff's employment was terminated and she sustained damages consisting of lost wages and benefits, mental anguish, emotional distress, pain and suffering and other pecuniary and non-pecuniary damages.

WHEREFORE, Plaintiff requests judgment on Counts 1 - 4 and damages consisting of lost wages, lost benefits, front pay, compensatory damages, interest, costs, attorney's fees, an amount equal to the tax on any award, and such other relief as the Court deems just and fair.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts.


/s/ *Carol I. Eisenberg*
Carol I. Eisenberg
Attorney for Plaintiff Monique Crummett

Richardson, Whitman, Large & Badger
465 Congress Street
P. O. Box 9545
Portland, ME  04112-9545
(207) 774-7474
ceisenberg@rwlb.com